AE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Equal Employment Opportunity Commission** | ) | |
| **Plaintiff, and** | ) | **05 C 5568** |
| **Elmer Bethancourth, et al.** | ) | |
| **Plaintiff-Interveners** | ) | **Judge Ronald A. Guzmán** |
| **v.** | ) | |
| **City of Joliet, et al** | ) | |
| **Defendants.** | ) | |

**ORDER**

Plaintiffs' emergency motion for a protective order is granted in part and denied in part.

**Introduction**

Plaintiff, EEOC, has filed a complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq. alleging unlawful employment practices, i.e., harassment and hostile work environment on the basis of sex, on behalf of a class of male employees who are adversely affected by such practices. Named as charging parties are Fidencio Antimo, Elmer Bethancourth and Diego Perez. These parties have also intervened as individual plaintiffs. EEOC also alleges that defendant retaliated against Elmer Bethancourth and a class of employees by terminating their employment. On November 28, 2005, this court entered a discovery and scheduling order which provided for fact discovery to be completed by June 30, 2006.

Plaintiff-interveners have filed an emergency motion in which they allege that on or about April 24, 2006, defendant required all employees to complete employment application forms for the first time. The application form consisted in part, at least, of a Department of Homeland Security (formerly Immigration and Naturalization Service ("INS")) Form I-9 "Employment Eligibility Verification." On this form, the employee is required, at the time he is hired, to certify under penalty of perjury that he is either a citizen, lawful permanent resident, or alien authorized to work and to provide true documentation (under penalty of federal law) to verify the declaration. Apparently, plaintiff-intervener Fidencio Antimo refused to fill out the form and directed defendant to speak to his attorneys regarding this information. Thereafter, on May 1, 2006, plaintiff-interveners' counsel received a letter from defendant's counsel advising that this information was needed from each of its employees in order for defendant "to be in compliance with all labor, Internal Revenue and immigration laws."

**Factual findings**

The court has heard the arguments of the parties and based upon the representations of the parties finds as follows.[1] Defendant has submitted to each of its current employees a Form I-9 as described above. In response to the court's inquiry, defendant's counsel indicated that the immigration form was required in order for his client to be in compliance with the immigration laws. Counsel also informed the court that his client has been in business since approximately

[1] Defendant's counsel urges an evidentiary hearing to resolve factual disputes, but this is unnecessary as the court is not relying upon any contested factual issues. Rather, the key facts recited and upon which the court relies are uncontested.

1989 and has never before required employees to fill out such a form. Further, each of the employees now being faced with this form was hired without having been required to fill out the form. When asked why his client had chosen this moment in time to make this first time effort to comply with the immigration laws, counsel responded that the plaintiffs' discovery requests had made his client aware of how incomplete its files were, and, thus, the determination to require the Form I-9 to be filled out for the first time in the history of the employer's existence.

The court finds defendant's explanation unconvincing. It is not plausible that this employer, in business since 1989, would now discover for the first time that its employee files were deficient in regards to immigration law requirements. Nor does the court find it convincing that the only motive for requesting such immigration status information at this particular point in time is the employer's sudden desire to be in compliance with its obligations under the immigration laws. Defendant would have the court believe that the fact of this current lawsuit by its employees is, in effect, a mere coincidence. It is clear that this is not so. Rather, the court finds that the main purpose behind this alleged new found desire to abide by the law is to effect a not so subtle intimidation of the intervener plaintiffs and all the potential class members. Such actions are meant to, and if unchecked most certainly will, chill the exercise of the employees' Title VII rights - which rights the current lawsuit was filed to safeguard.

**Discussion**

Counsel for defendant makes a point of asserting his client's duty and right to comply

with the immigration laws of the United States. However, as pointed out above, we find this argument rings hollow in the face of years of doing business during which defendant was, admittedly, in non-compliance with this particular aspect of the law. Furthermore, if allowed, defendant's actions will have the effect not of enhancing compliance with immigration employment laws, but of undermining the enforcement of and compliance with such laws. It is well known and understood that one of the main motivations for the hiring of undocumented workers is the reality that such workers are unlikely to complain if discriminated against, underpaid, overworked or subjected to abusive work environments because they fear deportation. Therefore, safeguarding the rights of such workers to enforce laws such as Title VII will, in effect, strengthen our immigration laws by removing one of the main motivations for hiring undocumented workers in the first place - one of the stated goals of the Immigration Reform and Control Act of 1986 ("IRCA"). *Patel v. Quality Inn So.*, 846 F.2d 700 at 704 (11th Cir. 1988). If employers are forced to treat such workers in the same manner as they must treat documented workers in all respects, a main incentive to hire the undocumented worker simply disappears.

Other Courts in similar situations have come to the same conclusion. An instructive example is found in *Galaviz-Zamora v. Brady Farms, Inc.*, 230 F.R.D. 499 (W.D. Mich. 2005). Migrant and seasonal agricultural workers brought a class action against employers under the Fair Labor Standards Act (FLSA) and the Migrant and Seasonal Agricultural Worker Protection Act (AWPA) to recover backpay for work already performed. *Id.* Defendants submitted to Plaintiffs various interrogatories and requests for production seeking information such as social security numbers, Plaintiffs' Alien Registration cards and copies of each Plaintiff's United States

birth certificate or Certificate of Birth Abroad issued by the United States Department of State. *Id.* Plaintiffs maintained that these discovery requests were designed for the improper purpose of determining their immigration status and moved for a protective order. *Id.* Defendants countered by asserting that plaintiffs' immigration status was relevant for purposes of establishing their entitlement to damages, standing to sue, credibility and also relevant as to class certification issues. *Id.* at 501. The court in *Galaviz-Zamora* found that the damage and prejudice which would result from the discovery into the immigration status of the employee plaintiffs would far outweigh whatever minimal legitimate probative value such information might have and barred the defendant from inquiring into the immigration status of its employees. *Id.* at 502. As pointed out in *Glaviz-Zamora*, other courts have found that the *in terrorem* effect of inquiring into the immigration status of employees suing their employer for unfair labor practices is devastating. *Id.* Not only does an undocumented alien face the reality of possible retaliatory adverse work place actions by the employer, but he or she also faces the very real possibility of being reported to the Department of Homeland Security and subsequent deportation or even criminal prosecution. Faced with such drastic consequences, most undocumented workers will withdraw their complaints. *Id.* A similar conclusion was reached by the court in *Flores, v. Amigon*, 233 F. Supp. 2d 462, 464-65 (E.D.N.Y. 2002).

Defendants in this case did not initiate their requests for documents and information through proper discovery processes, but rather by direct contact with the intervener-plaintiffs,

apparently claiming that they are not seeking discovery, but merely complying with their duty under IRCA and, therefore, are not subject to protective orders meant to control the discovery process. But as noted above, the court is not persuaded by this sudden declaration of patriotic motivation. In *Contreras v. Corinthian Vigor Insurance Brokerage, Inc.*, 103 F. Supp. 2d 1180 (N.D. Cal. 2000) plaintiff, Contreras, filed a claim against her employer, Corinthian, for unpaid wages and overtime pay pursuant to Section 98 of the California Labor Code with the California Department of Industrial Relations, Division of Labor Standards Enforcement. *Id.* at 1182. After plaintiff filed her claim, defendant caused plaintiff's undocumented status to be reported to the INS. "As a result of the communication with the INS, Contreras was arrested by the INS four days after a pre-hearing conference with the California Labor Commissioner regarding her wage and overtime claim, and held in their custody for a week." *Id.* Contreras alleged that Corinthian reported her to avoid liability on her claims and filed an action in federal court against her former employer for retaliation in violation of Section 16(b) of the Fair Labor Standards Act. In response, defendants argued that they were "merely verifying and clarifying information they had regarding Contreras' Social Security number, that they were required to report her undocumented status, and that they were just curious." *Id.* at 1186. The court found these reasons to be pretextual and further found that the employer's communication with the INS constituted an adverse employment action under the FLSA taken in retaliation for Contreras' claim. *Id.* at 1186-87.

Defendant's actions in the case at bar will be interpreted by any reasonable undocumented plaintiff or class member as nothing less than the first step towards being discharged, reported to

the Department of Homeland Security as an undocumented alien, or both. The least onerous consequence will be the loss of the plaintiff's job. The most onerous consequence will be precisely what happened to the plaintiff in the *Contreras* case - loss of job, arrest, detention and ultimately deportation. The intimidating effect of such conduct is hard to exaggerate. This step alone might be sufficient to end the lawsuit regardless of its merits.

This court has the authority under Federal Rule of Civil Procedure 26(c) to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." This authority includes the power to enter protective orders limiting discovery as the interests of justice require. For the reasons explained above, the court rejects plaintiff's assertion that its actions are not discovery, but rather simply an attempt to comply with its duties under immigration law.

Further, even assuming *arguendo* that defendant is correct as to the inapplicability of Rule 26, the court nevertheless has the authority in class action lawsuits pursuant to Rule 23(d) of the Federal Rules of Civil Procedure to prevent misleading or inappropriate direct communications with members of a class by either party. It has been recognized that such communications can have effects hard to undo at the end of the case, *EEOC v. Mitsubishi Motor Mfg. of Am.*, 102 F.3d 869 (7th Cir. 1996), and that direct communications with class members can lead to abuse. *Manual For Complex Litigation, Fourth* 248 ("Manual"). Indeed, one of the examples of abuse described in the Manual is the possibility that defendants might attempt to

obtain releases from class members without informing them that a proposed class action complaint has been filed. The direct communications before the court in the case at bar constitute conduct which is much more abusive than the example given in the Manual. This conduct is aimed, not at persuading the class members to drop their lawsuit, but rather at scaring them into doing so. Although the court hesitates to intervene in the communication between an employer and its employees, it is clear that plaintiffs and class members must be protected from intimidation which will deter them from asserting their rights under Title VII.[2] Absent such protection, there is a significant possibility that the lawsuit will be fatally undermined long before any determination on the merits.

[2] See *Gulf Oil Co. v. Bernard* 101 S.Ct. 2193, 2200-2201 and *Coles v. Marsh*, 560 F.2d 186, 189 (CA3),cert. denied, 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977) for the appropriate parameters and considerations in issuing Rule 23 protective orders.

**Conclusion**

For the reasons given above, the court grants the motion for a protective order in part. Defendant is barred from seeking any further information directly or indirectly from its current employees regarding their immigration status until the termination of this cause of action or a subsequent order of this court. Inquiries regarding the possession of a driver's license and other *bona fide* qualifications for the job which have historically been a part of the plaintiff's employment inquiry are not barred.

Dated: May 5, 2006

**SO ORDERED** **ENTER:**

**RONALD A. GUZMÁN**
**District Judge**

G:\Masterlist Folders\EEOC_v_Glenview 05-5568\Final Emerg Ord.wpd